**John E. STARR, Petitioner,**

v.

**FEDERAL AVIATION ADMINISTRA-
TION et al., Respondents.**

**No. 77–2015.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 11, 1978.

Decided Dec. 19, 1978.

As Amended Jan. 11, 1979.

Rehearing and Rehearing In Banc
Denied Feb. 15, 1979.

Raymond C. Fay, Chicago, Ill., for petitioner.

Michael F. Hertz, App. Section, Civ. Div., Dept. of Justice, Washington, D. C., for respondents.

Before FAIRCHILD, Chief Judge, NICHOLS, Judge,* and WOOD, Circuit Judge.

NICHOLS, Judge.

This case concerns the denial by the Federal Aviation Agency (FAA) of petitioner Captain John Starr's request for an exemption from the FAA's "Age 60 Rule," 14

* Judge Philip Nichols, Jr., of the United States Court of Claims is sitting by designation.

C.F.R. § 121.383(c) (1977). For reasons discussed below, we affirm the decision of the FAA.

### The Age 60 Rule

The Age 60 Rule was promulgated primarily to protect against the risk of a pilot's sudden incapacitation in flight from heart attack or stroke. 24 Fed.Reg. 9767 (1959). It prohibits any persons over age 60 from serving as a pilot in air carrier operations regulated under Part 121 of the FAA regulations, 14 C.F.R. § 121.1 *et seq.* Studies that indicate degeneration in physiological and psychological functions as age increases, and an apparent inability of medical diagnostic tests to indicate accurately the physical changes in pilots over 60, were and are the major justifications for the enactment and continuance of the rule. The rule has survived challenges on both procedural and substantive grounds. *See, e. g., Air Line Pilots Ass'n Int'l v. Quesada,* 276 F.2d 892 (2d Cir. 1960), *cert. denied,* 366 U.S. 962, 81 S.Ct. 1923, 6 L.Ed.2d 1254 *rehearing denied,* 368 U.S. 870, 82 S.Ct. 27, 7 L.Ed.2d 71 (1961); *O'Donnell v. Shaffer,* 160 U.S.App.D.C. 266, 270, 491 F.2d 59, 63 (1974). (In both cases the method of enactment and decision of the FAA to adopt/uphold the rule were upheld.)

On June 10, 1977, Captain Starr, a Boeing 747 pilot for United Air Lines, filed a petition for exemption from the Age 60 Rule, asserting that his physical condition warranted such an exemption. Starr's petition emphasized the testimony in *Houghton v. McDonnell Douglas Corp.,* 413 F.Supp. 1230 (E.D.Mo.1976), *rev'd,* 553 F.2d 561 (8th Cir.), *cert. denied,* 434 U.S. 966, 98 S.Ct. 506, 54 L.Ed.2d 451 (1977). Starr maintains that in *Houghton* defendant's own medical experts concluded that under currently available medical standards, it can be determined to a reasonable degree of certainty that an individual pilot will not suffer a sudden incapacitation in flight through heart attack or stroke. In *Houghton,* various experts, including Dr. Stanley Mohler, Chief of the Aerospace Application Division of the FAA's Office of Aerospace Medicine, testified that it was feasible to determine that a pilot is physiologically younger than his chronological age. These experts placed great reliance on longitudinal medical histories (continuous uniform medical profiles of the same subject over a period of years) and electrocardiogram testing (stress EKG's). Starr's petition for exemption was based on the medical standards and procedures relied upon by the experts testifying at the trial level in *Houghton.* Doctors who have evaluated Captain Starr's health in past medical examinations all revealed that he was in excellent health before and at the time of his petition for exemption, and no examiner encountered evidence of risk factors indicating potential stroke.

While Captain Starr's petition was pending, the FAA reaffirmed its support of the Age 60 Rule: Langhorne Bond, the FAA Administrator, offered the U. S. Senate the results of his personal review of the rule promised at his confirmation hearings earlier in the year. In a letter to Senator Zorinsky, Mr. Bond stated that his agency's studies had found currently available information to be insufficient to support the development of a psychophysiological age index or a means of predicting the eventual advent of incapacitating diseases which occur at increasing frequency with advancing age. Mr. Bond also stated that he was aware of no scientifically based criteria warranting an exemption from the Age 60 Rule, but noted that the FAA continuously monitored scientific studies and advances in aerospace medicine. On October 5, 1977, the FAA denied Captain Starr's petition for exemption, finding that the standards proposed by Captain Starr to determine his physiological age were incomplete and inaccurate.

### Scope of Review

In reviewing the FAA's order, we are not to judge whether Captain Starr is fit to fly. And we are not reexamining the validity of the Age 60 Rule, already affirmed as it has been, or reweighing the evidence introduced before the FAA Administrator when he made the determination to keep the rule in force.

The case at hand concerns denial of an exemption to a single individual on the merits, but the issue involved is broader than that. By the statements of counsel, the position of the FAA is that it will not grant an exemption for a single pilot over 60 unless it is in a position to establish new standards applicable to everyone. In other words, in this area it will not exercise its exemption authority, as such, at all. We examine here whether the FAA may establish an "exemption policy" that refuses to allow exemptions for a particular class of persons, i. e., those over 60. *Compare Coppenbarger v. FAA,* 558 F.2d 836 (7th Cir. 1977), where the issue was the procedural rights of a petitioner for exemption, and where this court specifically declined to establish a standard of review for denial of an exemption on the merits.

 Section 601 of the Federal Aviation Act, 49 U.S.C. § 1421(c), empowers the FAA Administrator to grant exemptions from FAA safety regulations governed by Title VI of the Act. It states:

The Administrator from time to time may grant exemptions from the requirements of any rule or regulation prescribed under this subchapter if he finds that such action would be in the public interest.

The FAA argues that the discretionary wording of that statute means that denial of an exemption from air safety regulations is one of those decisions excluded from any judicial review under the Administrative Procedure Act as "[an] agency action is committed to agency discretion by law." *See* 5 U.S.C. § 701(a)(2). But mere inclusion of discretionary terms in a statute and obvious contemplation by Congress that an administrator will be endowed with discretion in his actions, does not render a refusal to exercise discretion totally free from reviewability. *Cotonificio Bustese, S. A. v. Morgenthau,* 74 App.D.C. 13, 121 F.2d 884 (1941). A decision of the Civil Aeronautics Board under a similarly worded mandate, section 411 of the Federal Aviation Act, 49 U.S.C. § 1381 (allowing the CAB to investigate complaints of unfair competition if such investigation was in the public interest), was held reviewable in *REA Express, Inc. v. Civil Aeronautics Board,* 507 F.2d 42, 45 (2d Cir. 1974). And in a proceeding under another exemption provision of the Aviation Act, which also uses the language "the Administrator may grant exemptions" (49 U.S.C. § 1386), the court stated that the agency action was reviewable under 49 U.S.C. § 1486(a). *Island Airlines, Inc. v. Civil Aeronautics Board,* 363 F.2d 120, 121 (9th Cir. 1966). As the leading student of administrative law has stated, "[t]he question is not *whether* agency action is by law committed to agency discretion but *to what extent* agency action is so committed." 4 K. Davis, Administrative Law Treatise 33 (1958) (emphasis supplied).

 To use the jargon of the trade, we review the action or inaction of the FAA under an "abuse of discretion" standard. This is the standard normally applied when an agency is authorized to take a particular line, if found to be "in the public interest." *Blaha v. United States,* 511 F.2d 1165, 1170, 206 Ct.Cl. 183, 194 (1975). Although the Aviation Act requires review of findings of fact under a "substantial evidence" standard, 49 U.S.C. § 1486(e), *Pillai v. Civil Aeronautics Board,* 158 U.S.App.D.C. 239, 485 F.2d 1018 (1973), nonfactual analyses and agency conclusions drawn from facts are generally reviewed under an abuse of discretion standard. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1970); *Commonwealth v. Virginia v. Civil Aeronautics Board,* 498 F.2d 129, 133 (4th Cir.), cert. denied, 419 U.S. 1048, 95 S.Ct. 623, 42 L.Ed.2d 642 (1974); *O'Donnell v. Shaffer,* 160 U.S.App.D.C. 266, 491 F.2d 59 (1974). And in a recent case the Ninth Circuit carefully articulated its rationale for refusing to use the "substantial evidence" rule, for review of grant or denial of an exemption. *Tiger International v. Civil Aeronautics Board,* 554 F.2d 926 (9th Cir.), cert. denied, 434 U.S. 975, 98 S.Ct. 532, 54 L.Ed.2d 467 (1977). It noted that 49 U.S.C. § 1486(e) required that findings of fact be reviewed under a substantial evidence stan-

dard, but argued that such a standard was unworkable for an exemption proceeding. In proceedings requesting exemptions from a valid agency rule, the court noted, the bulk of evidence is petitioner's, since he must show that circumstances justify an exemption in his case. And if an agency's decision to grant or deny an exemption were to be judged under a substantial evidence rule, that agency would be forced to defend its standard rule in every exemption proceeding. Thus countermanding the whole purpose of a fixed agency rule—to eliminate the need for intensive hearings and factfindings in every case. Thus, ruled the Ninth Circuit, where no hearing is required (as in an exemption proceeding), the substantial evidence rule is also not necessary. This court has stated in *Coppenbarger, supra,* that no hearing is required before denial of an exemption from FAA safety rules; so the Ninth Circuit's reasoning could apply to this case.

█ Under the "arbitrary and capricious test," however, the administrator's discretion is still limited. He is bound by the statutory framework of the program administered by the agency. Thus, a court can review an administrator's decision to insure that he neither included in his analysis factors irrelevant to the congressional purpose of the program he administers, nor ignored factors which Congress has indicated are highly significant. *See* Sapherstein, *Nonreviewability: A Functional Analysis of "Committed to Agency Discretion,"* 82 Harv.L.Rev. 367 (1968).

Given this framework for reviewing the FAA's decision, it is important to note that Congress made a conscious decision to provide for a procedure allowing exemptions from air safety regulations. It added 49 U.S.C. § 1421(c) by amendment to Title VI of the Civil Aeronautics Act, when the Federal Aviation Act was passed in 1958. That act gave the newly established FAA control over the safety regulatory functions then currently under the jurisdiction of the Civil Aeronautics Board. This deliberate establishment of an exemption procedure indicates congressional intent that the FAA establish some method for granting exemptions from airline safety regulations if such exemptions would enhance the purpose of the act. The legislative history of the Federal Aviation Act provides no light on the exemption provision for safety regulations, merely noting that the administrator is given such power, H.R.Rep.No.2360, 95th Cong., 2d Sess. at 16 (1958). An examination of the act as a whole, and the legislative reasons for its passage, indicates an enormous congressional concern that the newly created FAA establish standards to protect the highest level of safety, and that the agency utilize new technology to achieve such safety. *See, e. g.,* 104 Cong. Rec. 16087 (1958) (remarks of Rep. Haskell). The administrator's use of his power to grant exemptions must be in harmony with these concerns.

### The Denial of Captain Starr's Petition

Captain Starr argues that the FAA's denial of his petition for exemption violates both this congressional directive and the FAA's own regulations allowing grants of exemptions from its rules, if the grant of such an exemption would provide a level of safety equal to that of the rule. 14 C.F.R. § 11.25. He argues that the results of his physical examinations, examinations based on the testing standards espoused by the experts testifying in *Houghton, supra,* do establish a level of safety equal to that of the Age 60 Rule. The FAA argues that the administrator has discretion to establish an exemption policy, and if he determines that interests of safety would best be served by allowing no exemptions from the Age 60 Rule, that determination should be allowed to stand.

█ We agree with the FAA that the administrator is entitled to establish an exemptions policy, and our scope of review in this case is thus limited to determining whether in light of the expectation by Congress that *some* exemptions will be granted, continuance of the policy of refusing exemptions for *this class* of petitioners is an abuse of discretion.

The "public interest" language of the statute authorizing exemptions would seem to direct a primary emphasis on the elimination of anomalies and inequities *(Blaha v. United States, supra),* rather than on the alleviation of personal hardship cases. No statute or regulation limits the specific subject-matter areas in which petitions for exemption may be entertained. Theoretically, any regulation of the FAA could be challenged in an exemption proceeding. But merely because any regulation could be challenged, it does not mean that the administrator *must* grant exemptions from the challenged regulation. It is reasonable to assume that the administrator can identify certain matters to be more appropriately subject to exemption procedures than others.

Establishment of a no-exemption policy could appear beneficial to both the agency and those whom it serves. First, it gives potential petitioners notice of the administrative hurdle they must face before they begin to invest their time and financial resources. Second, it establishes standards which prevent ad hoc judgments based on trifling differences. If no policy as to the Age 60 Rule existed, the Flight Standards Service (the organ of the FAA which rules on petitions for exemption) would be forced to evaluate individual exemption petitions of all pilots over 60. It would be making judgments based on voluminous medical records and standards which, in the opinion of the FAA, are neither clear nor sufficiently determinative of the absence of risk of heart attack or stroke. Such a practice would create anomalies and inequities rather than eliminating them. Given such tentative standards, the potential for differentiation based on arbitrary distinctions is high. Finally, no exemption policy eliminates the need for timely consideration of each individual case, some of which may present identical factors which are of controlling importance to the FAA. Indeed, the Second Circuit, upholding the Age 60 Rule, noted that the legislative history of the Aviation Act and prior practice under the Civil Aeronautics Act indicate that the administrator was to have "broad power to establish safety rules for the nation's airways without the delay attendant upon numerous individual hearings and protracted appeals." *Air Line Pilots Int'l v. Quesada,* 276 F.2d 892, 897 (2d Cir. 1960), *cert. denied,* 366 U.S. 962, 81 S.Ct. 1923, 6 L.Ed.2d 1254 (1961).

It might be better to publish a no-exemption policy for the involved rule rather than leave a regulation on the books that seems to say exemption from any rule can be petitioned for. In effect, Captain Starr's request for an individual exemption was predecided and foredoomed. It would have saved him, the agency, and the court much expenditure of resources to have said so. However, it would not be reasonable, especially in light of the statute, to construe the regulation as promising individual consideration in every instance, in a manner to bind the agency in advance.

Of course, some administrative policies could be an abuse of discretion, and this court would be able to reverse such a decision. For example, the FAA Administrator could not circulate a list of persons whom he personally disliked, saying that he found these persons "unfit for exemptions." *Compare Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1953), (Attorney General circulated list of "unsavory characters" whom he wanted deported). Deliberate disregard of new advances in medical testing standards that made it more readily feasible to measure the hazard person by person beyond the extent asserted here might require a different result, especially in light of congressionally expressed concern that the Federal Aviation Agency keep abreast of the progress in safety equipment and techniques. H.R. Rep.No.2360, 85th Cong., 2d Sess. at 7. However, if it is evident that the agency has not shirked its duty to examine such standards, but simply has chosen what it considers the safer of two or more opposing standards, this court will not examine further. As things are now, if the Age 60 Rule is reasonable, as it has been held to be, it is not abuse of discretion to reject any individual application for exemption even if the

applicant demonstrates that he personally is a superman immune from the impairments that age normally inflicts. The court will defer to the discretion allowed the FAA by Congress to determine the type and scope of air safety rules, *Fielder v. United States,* 423 F.Supp. 77, 82 (C.D.Cal.1976), even if on its own the court might have made different findings or adopted different standards. *See Greater Boston Television v. Federal Communications Commission,* 143 U.S.App. D.C. 383, 444 F.2d 841 (1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

Petitioner has presented this court with a great deal of information regarding the FAA's more liberal grant of exemptions for pilots suffering from the problems of alcoholism or recovering from heart attack, who would under the regulations be unable to continue employment. The petitioner argues that first, if the FAA carries out those exemption policies, it should allow exemptions from the Age 60 Rule. A second and related argument is that exemption from the Age 60 Rule is probably as safe or safer than the exemptions offered recovered alcoholics or heart attack victims.

▪ These arguments lack merit, given the scope of this court's review. First, even if those more liberal exemption policies were found to be unsafe, that does not justify introduction of another program which the FAA's own experts consider unsafe. And more importantly, merely because FAA policy allows more liberal exemptions in these two situations, the FAA need not establish exemptions from the Age 60 Rule. The rationale for exemptions is to allow an administrator flexibility. Ruling that a liberal exemption policy for one set of circumstances requires such a policy in other circumstances deemed by the agency to be less suitable to safe exemption processes would result in an all-or-nothing policy of exemptions, with the possible effect of denying exemptions in all cases, and limiting the administrator's ability to provide optimum air safety in the public interest.

Counsel for Captain Starr say he is still flying, on international routes and charter flights not subject to the "Age 60 Rule." They seem to feel the fact establishes that the rule is absurd, but it also impresses us that it is not so harsh. It does not force a man into retirement as do or did so many typical "age discrimination" rules.

Petitioner overemphasizes the significance of the Eighth Circuit decision in *Houghton v. McDonnell Douglas Corp., supra.* The differences between *Houghton* and the present case are important in themselves and because of their effects on burden of proof. Plaintiff in *Houghton* was a 52 year old test pilot, dismissed during a manpower cutback because he was the oldest test pilot and it was the defendant-company's intuitive judgment that older pilots were less safe. Houghton sued under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 *et seq.* Defendant McDonnell Douglas admitted discriminating by age, and attempted to argue that in this case, age was a bona fide occupational qualification (BFOQ), entitling the employer to exemption under the Age Discrimination in Employment Act, 29 U.S.C. § 623(f)(1). But to obtain a BFOQ for test pilots, the defendant had to prove that "the Company has a factual basis for believing that substantially all of the older pilots are unable to perform the duties of test pilot safely and efficiently or that some older pilots possess traits precluding safe and efficient job performance unascertainable other than through knowledge of the pilot's age." 553 F.2d at 564.

▪ Here Captain Starr does not rely on that Act as the involved "Age 60 Rule" has already been determined to be a BFOQ. The Labor Department so ruled in 1968. R. 197, 33 Fed.Reg. 9172 (1968). We are dealing with a cutoff at age 60, a cutoff formulated after an administrative agency's thorough examination of medical evidence. And it is petitioner Starr who has the burden of demonstrating that the FAA's reliance on the Age 60 Rule and its rejection of his standards of measuring physiological age were totally without reasonable foundation.

Given that in *Houghton* the burden to prove a justification for the age discrimination was on defendant, the Eighth Circuit was not obligated to and did not adopt a series of tests that a pilot must pass in order to demonstrate his ability to fly past a certain age without serious safety risks. Rather, the Eighth Circuit held that McDonnell Douglas failed in establishing the prerequisites for a BFOQ, and noted that there was "a total absence of evidence which would indicate he [plaintiff Houghton] was not capable of performing test pilot functions." 553 F.2d at 564. And nowhere in the opinion is it suggested that the tests offered by Houghton should be the basis for some national standard.

The FAA did not have to accept the *Houghton* tests nor analyze the facts of Starr's case in light of *Houghton*. The FAA's order denying the exemption does indicate that the agency scrutinized the standards offered as tests in *Houghton*, but decided that they were inadequate to form a basis for determining physiological age or functional capacity. The agency detailed why it felt that the *Houghton* analysis was inadequate:

> * * * The standards [proposed by petitioner] deal almost exclusively with tests intended to discover the presence of degenerative diseases, and those standards fall far short of the state of the art for determining the presence or absence of such diseases * * *. Furthermore, the proposed standards fail to cover the psychophysiological functions which deteriorate with age and are relevant to skilled performance.
>
> Studies show that abilities to perform highly skilled tasks rapidly, adapting to new and changing environmental situations, resisting fatigue, maintaining physical stamina, and performing effectively in a complex and stressful environment begin to decline in early middle life and continue declining at a fairly steady rate thereafter. However, no method has been established by which quantitative assessments can be made regarding the probable decrement of skilled performance by individual age-altered functions or by the cumulative effect of multiple age-altered functions.

At present, different views exist as to the possibility of developing a reliable functional age index for pilots. The FAA, mindful of the congressional mandate to insure that air carrier services are performed "with the highest possible degree of safety in the public interest," 49 U.S.C. § 1421(b), has accepted the view of one group of medical experts and rejected the opinions of others. We cannot assert that the FAA is blindly adhering to an outdated rule, and thus abusing its discretion to establish safety standards, as long as a body of medical opinion continues to doubt the feasibility of a physiological age index. This court is not an expert in aerospace medicine, and Congress did not endow this court with the duty to make such a policy judgment. *Compare Velasco v. Immigration & Naturalization Service*, 386 F.2d 283 (7th Cir. 1967), where this court held that a denial of a waiver from an immigration regulation would be set aside only if abuse of discretion were shown.

 The FAA has the discretionary power to establish a policy that there will be no exemptions granted until it is satisfied that medical standards can demonstrate an absence of risk factors in an individual sufficient to warrant a more liberal application of the Age 60 Rule. Until the FAA determines that such standards exist, it may adhere inflexibly to a rule whose validity has been upheld by the courts and whose policies were reevaluated and articulated to the Senate in 1972 and 1977, as long as it continues to consider new advances in medical technology. Satisfied that it has done so here, we hold that its denial of an exemption to Captain Starr was not an abuse of discretion.

### Disqualification of the Federal Air Surgeon

Petitioner also urges error here in the refusal of the Federal Aviation Administration to disqualify the Federal Air Surgeon, Dr. H. L. Reighardt, on account of unaltera-

ble bias and prejudgment. Respondent says, however, that he did not make the decision here under review. The record shows it was signed by Mr. Scully of the Flight Standards Service, a branch independent of the Air Surgeon. Both were concerned with air safety. It is reasonable to suppose that the Air Surgeon would have considerable input respecting an agency decision involving medical questions such as those we have here, but petitioner does not point to any delegation or chain of authority showing that Dr. Reighardt acted as more than a staff adviser, influential though he must have been. Both Mr. Scully and Dr. Reighardt were, as we understand it, civil servants and staff advisers under the administrator and deputy administrator who were presidential appointments. 49 U.S.C. §§ 1341, 1343, 1652; 30 Fed.Reg. 3395, 3398–99. It is clear that Dr. Reighardt had strong adverse views, that he participated in preparation of a position paper that opposed relaxation of the "Age 60 Rule," and that he had tried to discourage filing of Captain Starr's petition.

Petitioner relies on a number of reported cases in which courts have forced chairmen or members of federal regulatory and adjudicatory agencies to step down when they have exhibited prejudgment or bias concerning matters before them. *E. g., Cinderella Career and Finishing Schools, Inc. v. FTC,* 138 U.S.App.D.C. 152, 425 F.2d 583 (1970) and cases there cited; *Gilligan, Will & Co. v. SEC,* 267 F.2d 461, 468 (2d Cir.), *cert. denied,* 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152 (1959). Since oral argument in this case, Judge Gesell, in the United States District Court for the District of Columbia, has ordered the present Chairman of the Federal Trade Commission out of an important case, *Association of National Advertisers v. FTC,* D.C., 460 F.Supp. 996 (1978). There can be no doubt that courts have insisted and will insist on absence of partiality or even the appearance of it by those exercising quasi-judicial functions, or authorized to form conclusions of fact or law upon written records.

The first problem for us is that the FAA is not by law organized as are the FTC, SEC, NLRB, etc., and the cases do not teach how we should react to alleged bias by its staff adviser, or one not shown to be more than such. We do not rule out the possibility that acute enough and improper enough bias in an active enough staff adviser might infect the entire decision of the agency. *Cf. United States v. Mississippi Valley Co.,* 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961) (illegal conflict of interest by mere consultant).

■■■ It is not improper, even for members of regulatory commissions, to form views about law and policy from their proper efforts to adjudicate earlier cases before them, that will persist in their minds and influence the outcome of later cases. *FTC v. Cement Institute,* 333 U.S. 683, 702, 68 S.Ct. 793, 92 L.Ed. 1010 (1948). *See* K. Davis, Administrative Law Treatise § 12.06 (1972). Here it is not shown that Dr. Reighardt did not form his views in the course of performing his proper functions in connection with earlier issues relating to the "Age 60 Rule" that arose before Captain Starr filed his petition. The matter seems to have been quite continuously at a simmer or a boil. He did nothing illegal. There is nothing to show Dr. Reighardt did what he did from personal animosity to Captain Starr, or for any corrupt or wrongful purpose. He is entitled to the normal presumption of good faith that, in courts of law, government officials still enjoy, that must be refuted by well-nigh irrefragable proof. *Knotts v. United States,* 121 F.Supp. 130, 128 Ct.Cl. 489 (1954).

■■■ The petitioner moved to the FAA that Dr. Reighardt be "disqualified from participating," and with reference to a staff adviser, it leaves us, and must have left the agency, uncertain what he was or was not to do. Allowance of the motion would not have prevented the deciding officers from reading what Dr. Reighardt had already written and they might presume his opinion had not changed. In view of this, even if denial of the motion was error, which we do not hold, it would not have been prejudicial error. Petitioner accomplished his purpose

of bringing forcibly to the agency's attention his contention that Dr. Reighardt was biased. It is not clear the motion was not in effect granted when the substantive decision was routed to Mr. Scully for signature.

For the foregoing reasons, we conclude the refusal to disqualify Dr. Reighardt was not error, or was harmless error, and the fairness of the decision on the main question was not in any way infected.

Accordingly, the decision of the Federal Aviation Agency is

AFFIRMED.

Sprecher, Circuit Judge, dissented and filed opinion.